Garrahan, Appellant, *v.* Glen Alden Coal
Company.

Argued March 2, 1942.

2

Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*John A. Gallagher,* with him *Roger J. Dever,* for appellant.

*J. H. Oliver,* with him *Franklin B. Gelder,* for appellee.

OPINION BY RHODES, J., April 29, 1942:

The material question in this workmen's compensation case now is the same as when it was here before *(Garrahan v. Glen Alden Coal Co.,* 135 Pa. Superior Ct. 307, 5 A. 2d 437). That question is whether "deceased was traveling in the slope instead of the manway, at the time he was injured, in violation of the positive orders of defendant, and consequently not in the course of his employment." In the original proceeding the referee awarded compensation to claimant on behalf of herself and her minor child for the death of her husband, and the award was sustained by the Workmen's Compensation Board and the court below. Because of "the equivocal character of the board's opinion and the evident conflict between its finding and that of the referee, which it affirmed," we reversed the judgment and remitted the record to the court below

with instructions to transmit it to the board for further action not inconsistent with this court's opinion. Ultimately the case was remanded to the referee. When it came on for hearing neither party offered additional testimony. Consequently, it is unnecessary to restate the facts which were recited at length in our previous opinion at 135 Pa. Superior Ct. pages 309, 310.

The referee, having found that deceased's presence at the point where he was discovered was in violation of positive orders of defendant, denied compensation on the ground that deceased did not receive his fatal injury in the course of his employment. Claimant appealed to the Workmen's Compensation Board which set aside all previous findings of fact, substituted seventeen findings of its own, and awarded compensation. The decision of the board was reversed by the court below, the award in favor of the claimant was set aside, and judgment was entered for defendant. Claimant has appealed.

The fourteenth, fifteenth, sixteenth, and seventeenth findings of fact made by the board are as follows:

"Fourteenth: When the deceased was first employed in defendant's mine as a door tender he was told by his superiors not to use the slope, but to use the manway.

"Fifteenth: The deceased was later promoted from door tender to brakeman with the duty of throwing certain switches as above described. Neither at the time when he was appointed to this work nor thereafter were any instructions or orders given to him not to use the slope.

"Sixteenth: The nature of deceased's employment required that he walk up the slope to throw the first switch. At the time of the accident, deceased was proceeding from the first switch to the double switch; in proceeding up the slope to a cross cut closer to the double switch the deceased was not violating a positive order of his employer.

"Seventeenth: That the injuries sustained by deceased which caused his death were sustained by accident at a place on the operating premises of his employer where the nature of his employment permitted him to be at at the time."

From these findings and the discussion of the case which precedes them in the board's opinion, it is obvious that two factors moved that body to reverse the referee and to award compensation. One is the alleged failure of appellee to repeat the prohibition against traveling in the slope when deceased's employment changed from door tender to brakeman. The other is that because deceased habitually used the slope in order to throw the first switch, which was located near the foot thereof, his presence on the slope at the point where he was found did not constitute a violation of the order as the nature of his employment permitted him to be there. We do not think either theory is tenable.

The fifteenth finding of fact is subject to at least two objections. First, there is not a scintilla of evidence to show that no orders were given to deceased prohibiting his use of the slope at the time his employment changed from door tender to brakeman, or at times thereafter. The record is replete with testimony as to the existence of this rule—every witness who worked in the mine acknowledged it—and for all that appears it might have been repeated periodically.[1] Consequently, the board's fifteenth finding is only a conjecture, and violates the fundamental principle that findings of fact made by the compensation authorities

---

[1] Walter Jones, mine foreman, testified: "Q. When you hired him [deceased] what instructions did you give him pertaining to the use of the slope and manway? A. That he should not walk or ride the slope, he should walk in the manway."

Brinley Evans, fire boss, testified: "Q. Had you ever talked to him—had you ever given the decedent any orders about the use of the slope? A. Yes. Q. What did you tell him? A. I told

"shall be based only upon sufficient, competent evidence to justify same": Section 422 of the Workmen's Compensation Act of 1915, as amended by the Act of June 21, 1939, P. L. 520, §1, 77 PS §834. Secondly, the opinion of the Workmen's Compensation Board furnishes neither reason nor rule necessitating the repetition of such orders as it found to have been issued by appellee in this case. Contrary to the board's statement that "we have no right to assume that instructions given to door tenders necessarily apply to other employees," the better reasoning would seem to be that orders once given remain valid and effective until countermanded. It is apparent from this record that the rule prohibiting employees from using the slope was of general application, and designed to minimize the danger inherent in that portion of the mine's operation. That danger did not vary with the particular job of the person using the slope, but was common to all.

Naturally there were some (such as the witness Berkowski, whose job as slopeman or planeman was to ride the trips of cars up and down the slope) whose work required them to use the slope, and to whom the rule could not apply. The sixteenth and seventeenth findings of fact made by the board attempt to place deceased in that class, but the evidence fails to support them. While "acts in disregard of positive orders of the employer where the employee's duties included the doing of the act that caused the injury, or where his duties were so connected with the act that caused the injury that, as to it, he was not in the position of a

---

him not to walk the slope or to ride the trip. Q. How did you tell him to get out to the surface? A. Up the manway."

John Kuchta, section foreman, testified: "Q. And what orders did you give Mr. Garrahan about use of this slope? A. I told him not to walk the slope or ride the trip, always use the manway. Q. Did he have any duties to perform on the slope? A. No, sir."

stranger or trespasser," do not preclude compensation for injuries sustained therefrom, nevertheless "injuries resulting from those acts which are in direct hostility to and in defiance of positive orders of the employer concerning instrumentalities, places or things about or on which the employee has no duty to perform, and with which his employment does not connect him, are not compensable under the clause in question": *Dickey v. Pittsburgh & Lake Erie R. Co.*, 297 Pa. 172, at page 175, 146 A. 543, at page 544. Here, under the board's own findings,[2] it was unnecessary for deceased to use the slope to arrive at either the single switch near the foot thereof or the double switch about 1,500 feet farther up the slope between the latter and the manway. He was found mortally injured at a place[3] where the performance of his duties neither required nor permitted him to be. It is idle to argue that he may have been injured elsewhere in the absence of any evidence whatsoever to support such an inference. The evidence bearing upon the question is persuasive of an opposite conclusion. The testimony is undisputed that the only injury to deceased was the laceration of his thigh and the severance of the femoral artery. The body was un-

---

[2] "Ninth: There were three switches to be thrown. The first was located on a branch near the foot of the slope, and to the right of the slope. The other two were in a double switch located in the manway about 1500 feet up from the first switch.

"Tenth: There were two ways of reaching the first switch. The shortest way was by going up and across the slope; the other way was through old, abandoned workings, 200 feet farther than by way of the slope. The deceased always walked the slope way to throw the first switch.

"Eleventh: After throwing the first switch, it was necessary for deceased either to return the long way round through the abandoned workings to the manway and thence up the manway to the double switch or to cross the slope and go through one of the cross cuts to the manway."

[3] "Twelfth: The deceased's body was found about midway between two crosscuts and fourteen hundred feet up the slope."

marked otherwise, and the board has so found.[4] It is unlikely that deceased was dragged to the point where the cars became derailed, and the board's statement in its sixteenth finding of fact that deceased was "proceeding" up the slope from the first switch to the double switch can be predicated only, without undue violence to the language, on a voluntary, as distinguished from an involuntary, passage.

The case at bar is governed by *Dickey v. Pittsburgh & Lake Erie R. Co.*, supra. The rule laid down in that case has been applied consistently by this court in later cases.[5]

The principle announced in *Flucker v. Carnegie Steel Co.*, 263 Pa. 113, at page 119, 106 A. 192, at page 194,[6] has no application to a case like the present one where the employee was found dead or dying at a place on the premises of his employer, where his presence was prohibited, and where none of his duties required or permitted him to be. As was said in the Dickey case, supra, 297 Pa. 172, at page 176, 146 A. 543, at page 545: "Here the servant was directed to take a definite way built for that purpose. He followed this course repeatedly as instructed to do; not once, but often. On this [occasion], in defiance of these positive orders, he left the way, took [another which he had been ordered not to use], and as a consequence was killed in the

---

[4] "Sixth: Dr. S. M. Davenport who examined deceased's body found a laceration between 6 and 8 inches long, 3 inches deep at the deepest point on the inner aspect of the right thigh running toward the groin; the femoral artery was severed; there were no other marks on the body and the face, hands, and arms were in good condition."

[5] *Palla v. Glen Alden Coal Co.*, 105 Pa. Superior Ct. 96, 160 A. 157; *James v. Susquehanna Collieries Co.*, 113 Pa. Superior Ct. 326, 173 A. 485; *Robertson v. Frank Rieder & Sons et al.*, 114 Pa. Superior Ct. 518, 174 A. 604; *Yannick v. Lehigh Valley Coal Co.*, 126 Pa. Superior Ct. 431, 191 A. 213; *Kuzmick v. Hudson Coal Co.*, 135 Pa. Superior Ct. 281, 5 A. 2d 453; *Rolling v.*

attempt. Here was a plain violation of positive instructions. It concerned a matter designed for the safety and protection of employees. He had no duty to perform on the place of the accident or the instrumentality that killed him nor did his work bring him in any manner in contact with them; as to these he was a stranger. To sustain a different theory would weaken the beneficial effect of the law, take from the employer all opportunity to guard against accident and make discipline in a plant merely a thing of words only. Where an employee violates a positive rule as to entering forbidden parts of the owner's premises about which he has no duty to perform, or disobeys instructions against starting machinery or other dangerous agencies with which his work is not connected, and with which he has no business, and an injury results, he not only violates the orders of his employer, but is in the position of a trespasser, who without right, authority or permission enters forbidden ground."

Judgment is affirmed.

---

*Jeddo-Highland Coal Co.,* 136 Pa. Superior Ct. 153, 7 A. 2d 135; *Soroka et ux. v. Philadelphia & Reading Coal & Iron Co.,* 138 Pa. Superior Ct. 296, 10 A. 2d 904.

[6] "Where no facts appear indicating anything to the contrary, it may be presumed logically that an employee *at his regular place of service,* during his usual working hours, is there in discharge of some duty incident to his employment; and, when the dead body of an employee is found on the premises of his employer, *at or near his regular place of service,* under circumstances fairly indicating an accidental death which probably occurred during the usual working hours of the deceased, the inference may fairly be drawn, in the absence of evidence to the contrary, that the employee was injured in the course of his employment." [Italics supplied.]